Filed 9/30/16  P. v. Walker CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOHN CHRISTOPHER WALKER,<br><br>    Defendant and Appellant. | H041993<br>(Santa Clara County<br> Super. Ct. No. C1227932) |

Defendant John Christopher Walker pleaded no contest to eight counts of lewd acts on a child under age 14 (Pen. Code § 288, subd. (a)),[1] two counts of continuous sexual abuse of a child (§ 288.5), and one count of possession of child pornography (§ 311.11, subd. (a)).  Defendant requested a certificate of probable cause on the grounds that trial counsel provided ineffective assistance and that his *Marsden*[2] motions were erroneously denied.  The trial court granted his request.  Appellate counsel has filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*) on behalf of defendant.  Defendant has filed three letter briefs.  We affirm the judgment.

---

[1]    All further statutory references are to the Penal Code unless stated otherwise.
[2]    *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

1

## I. Factual and Procedural Background

### A. First Amended Complaint

In July 2012, a first amended felony complaint was filed and charged defendant with: 11 counts of lewd acts on a child under age 14 (§ 288, subd. (a)), two counts of oral copulation or sexual penetration with a child age 10 or under (§ 288.7, subd. (b)), and one count of possession of child pornography (§ 311.11, subd. (a)). One-strike allegations were attached to each of the section 288, subdivision (a) counts. (§ 667.61, subds. (b), (c), and (e).)

### B. Preliminary Hearing

In September 2012, the preliminary hearing was held. Lauren Doe testified that she was currently 10 years old. In 2009 and 2010, when she was in the second grade, defendant was her nanny. Defendant entered her room at night, pulled down her covers, pulled down her pants, and stuck his tongue in her vagina on three or four occasions. She was scared and did not tell her parents.

When Lauren was in fourth grade, she invited friends to use the pool at her house. As the girls were changing into their swimsuits, defendant was present and he sometimes helped them get dressed. During these changing sessions, defendant touched Lauren's body. Defendant also touched her vagina more than 10 times. On one occasion, he thought that she had a rash, touched her vagina, and said, "Oh, no, it's just the lighting." On another occasion, Lauren's pants were down and defendant said he thought that she had a bruise on her vagina. He placed his hand above her vagina for about 20 seconds. Defendant sometimes bathed Lauren. Though she would tell him that she was going to take a shower, he told her, "I'll give you a bath. It goes a lot quicker." When she was 10 years old, he touched her everywhere, including inside her vagina, during the bath. Defendant also showed her a video on his computer of a girl stripping. Her friends were also present. He told the girls never to do that.

2

Dana Doe, Lauren's older sister, testified regarding uncharged incidents. She woke up one night to find defendant sitting on her bed, told him to leave, and went back to sleep. She woke up again to find him lying on the floor. When she yelled at him, he did not wake up. She threw a pillow at him and he left. The following morning, defendant told her that he had been sleepwalking. Defendant also commented sometimes on the size of Dana's breasts as well as those of her friend. When Dana was in sixth grade, she and her friends played a game called truth or dare. Dana lifted her top and her friend, Angelica, removed her shirt. Defendant also played the game and removed his shorts.

Audrey Doe testified that she saw defendant sometimes at Lauren and Dana's house. When she was 11 years old, she was changing into her swimsuit while defendant, Cheyenne, and D. Doe were present. Defendant touched her breasts and commented that she did not have anything there.

Jessica Doe testified that she sometimes spent the night at Lauren and Dana's house. D., Cheyenne, and defendant were present, but Lauren and Dana were not. They played truth or dare in the living room. Jessica, D., and defendant kissed each other on the cheek at the same time. During the game, D. also took off her top, bra, underwear, and pants. Cheyenne and Jessica took off their tops and bras and defendant took off his pants.

According to Jessica, D. showed her a Web site called Omegle on defendant's computer. Defendant was present when they went on this Web site and he told them that they would get in trouble for going on the Web site. Defendant also told D. that if she removed her top and bra and put her breasts towards the camera, it would make a male on this Web site ejaculate. On another occasion, he told her sister Jasmine Doe and D. to take off their tops, pants, and underwear, and their naked breasts were visible on the Omegle Web site.

3

Jessica also testified that defendant touched her on several occasions. He gave her massages every time she went to Lauren and Dana's house. On one occasion, he massaged her back about two inches from her buttocks and on the cleavage between her breasts. On another occasion, he massaged her while she was lying on the couch. A few days after Jessica told family members that defendant had given her a massage, she was interviewed by the police.

Jasmine testified that she met defendant at Lauren and Dana's house. D., Jessica, Lauren, and a couple of their friends were also present. D. suggested that they access the Omegle Web site, but defendant said he "wasn't sure about [them] going on it." D. lifted up her shirt. Defendant told them that squeezing their breasts together made them appear bigger and "every person would start to chat" on the webcam. According to Jasmine, Omegle had a game of different levels. Level one involved moaning and level five involved putting a toy in one's "private." On her last visit to Lauren and Dana's house, they were on the Omegle Web site. Cheyenne and D. had their shirts and pants off. Jasmine lifted her shirt to show her naked breasts while defendant was right next to her. On the other side of the webcam, a naked man was lying on a bed and masturbating. When Lauren and Dana's parents came home, defendant told them to get dressed quickly. They then rushed to his house where they continued on the Omegle Web site with Jasmine and D. showing their naked breasts online.

On the last visit, defendant gave Jasmine a massage on the couch in the living room. He massaged her back from the top to just above her buttocks and the top of her breast area. Defendant also gave a massage to D., who was not wearing a shirt, but only a bra. Defendant told Jasmine not to tell anyone about the massages or the Omegle Web site, because he could lose his job. Jasmine told her aunt and mother, who eventually called the police.

D. testified that she first met defendant at Lauren and Dana's house. She and her friends, Jessica and Cheyenne, went on the Omegle Web site, which was bookmarked on

4

defendant's computer, before defendant arrived at the house. While defendant was present, they observed men masturbating on the Web site. On another occasion, they went on Omegle and she and Cheyenne took off their bras in front of the webcam. Defendant, who was then sitting on the couch next to D., touched her right breast and said "It's squishy." Jessica and Jasmine did not remove their clothes. At some point, they went to defendant's house where he touched her breasts again. D. also recalled that defendant was watching her take off her clothes while playing truth or dare. Defendant told her not to tell her parents about the games, because he would get in trouble. Defendant also suggested that D. show her breasts to get men on the other end of the webcam to stay on the camera.

Karin Doe, who was then 13 years old, testified that defendant was her nanny when she was in first grade. Karin was 10 or 11 years old when she spent the night at Lauren and Dana's house. Karin identified a photo of her breasts and defendant's hand. She did not know that the photograph had been taken. When she was 12 or 13 years old, she went on the Omegle Web site with defendant, took off her top, and showed her breasts. Karin also played truth or dare with defendant and exposed her breasts. When her breasts were beginning to develop, defendant touched her over her shirt and made a comment about them.

Robyn Doe testified that defendant had been her babysitter and nanny. When she was about 11 years old, he held her breasts and examined them. He told her that it was okay for him to be in her room while she was changing, because he was like her dad. He also commented on her breasts. When Robyn was 13 years old, defendant said that he had never seen how a tampon worked so he watched her insert a tampon into her vagina.

M. Doe testified that she was 10 years old. Defendant babysat her at Lauren and Dana's house two to three days a week. When she changed into a swimsuit, defendant was in the room and he saw her naked more than 20 times. Sometimes he would help her put on her swimsuit, but she did not need help. He said, "they are developing," and

5

touched her chest area. He also made comments about her vagina. On one occasions, he said, "You have a long hair there and let me get the scissor to cut it short." He got a pair of scissors and cut her hair. Defendant also showed M. a video called "Let's Party." The video showed girls, who were 10 to 12 years old, taking off their shirts.

Police officers testified regarding the seizure of defendant's desk top and laptop computers. An examination of the hard drive of the desk top computer revealed approximately 64,630 still images of young females in various stages of clothing and in various positions. Some of the images showed prepubescent children engaging in sex acts. There were also videos involving adults engaged in sex acts with children.

### C. Information

Following the preliminary hearing, the information was filed and charged defendant with 10 counts of lewd acts on a child under age 14 (§ 288, subd. (a) - counts 1-4, 7-12), two counts of oral copulation or sexual penetration on a child age 10 or under (§ 288.7, subd. (b) - counts 5, 6), and one count of possession of child pornography (§ 311.11, subd. (a) - count 13). One-strike allegations were attached to each of the section 288, subdivision (a) counts. (§ 667.61, subds. (b), (c), and (e).)

### D. Discovery and Pretrial Motions

Retained counsel represented defendant until May 2013 when he was relieved and the public defender's office was appointed to represent him. On January 22, 2014, defense counsel issued a subpoena for Lauren's school records for impeachment material. The trial court reviewed the records in camera and found no relevant documents.

In March 2014, jury trial was scheduled to begin. However, defense counsel requested a continuance. She represented that she had been organizing discovery, which prior counsel had provided in two installments five months apart. During the previous 10 months, she had reviewed the discovery, conducted an investigation, and conferred with

6

defendant. There were 64 witnesses involved in the case and the police had recorded the majority of the witness interviews. The alleged victims had been interviewed multiple times and these interviews were recorded. Defense counsel reviewed the evidence with defendant, though this process was hampered by his custodial status. Defense counsel also had not yet had the material seized from defendant's computer examined by an independent expert. In addition, the prosecutor had recently informed her that she would be calling an expert on child sexual abuse accommodation syndrome (CSAAS), and defense counsel needed to retain an expert of similar competence. The trial court granted the continuance.

In May 2014, defense counsel requested another continuance. The prosecutor had recently stated her intent to introduce propensity evidence under Evidence Code section 1108. This evidence involved two investigations of defendant for inappropriate conduct with children at four daycare/preschool institutions. Defense counsel had begun reviewing the approximately 400 pages documenting the investigations and conducting her own investigation of witnesses. However, there had been delays in her investigation, because the contact information for the witnesses was over 10 years old and inaccurate. The case was continued until August 2014.

On August 12, 2014, defense counsel filed several in limine motions: a motion to exclude or limit expert testimony on CSAAS; a motion requesting a hearing on the issue of competency of any minor witness; a motion to preclude the use of the term "victim" for the complaining witnesses; a motion requesting a hearing before the admission of any statement attributable to defendant; a request that defense counsel be allowed to question the mother of two of the complaining witnesses; a motion to exclude certain evidence; a motion requesting that the trial court admonish witnesses not to confer with each other and to exclude nontestifying witnesses from the courtroom; a motion to exclude prior uncharged sexual misconduct under Evidence Code section 1108; and a motion to exclude "fresh complaint" and "outcry" evidence.

7

### E.  First *Marsden* Hearing

On the same day that the defense motions were filed, defendant filed a *Marsden* motion in which he argued that he had been deprived of adequate representation.  A hearing was held.  Defendant stated that he had filed a malpractice action against defense counsel to create an actual conflict of interest.  The trial court informed him that he could not create a conflict.  Defense counsel stated that the lawsuit would not compromise her ability to represent him.

Defendant stated that his counsel had not met with him enough.  Defense counsel stated that she had visited him in April and sent him two letters.  When she tried to visit him in July, he declined to meet with her.  Defendant and defense counsel disagreed about legal strategy, but she informed him that these issues were within her control.  She also explained that he had the option of representing himself.

Defendant asserted that defense counsel had not provided him with 40 percent of the discovery.  Defense counsel responded that she had been providing him with material as she received it and that she would provide defendant with a copy of the Department of Social Services report.  Defense counsel also noted that defendant tended to change his mind about which materials he wanted.

Defendant believed that defense counsel's negative approach was alienating favorable witnesses.  Defense counsel stated that the investigators had attempted to contact about 70 people and had obtained statements from about 45 people.  Most of the statements were not helpful to the defense case, but some might be useful for rebuttal.  Defense counsel also stated that she had done about 20 cases that were as serious as defendant's case and had experience working with investigators.  She noted that the investigators had 20 years of experience, including cases involving children.  The trial court denied the *Marsden* motion.

## F. Change of Plea

On August 14, 2014, the trial court heard in limine motions. Following a break, the trial court stated that the attorneys had engaged in settlement discussions. There were two offers: one was a determinate term of 45 years, and the other was an indeterminate term of 30 years to life. The trial court gave defendant the opportunity to speak with defense counsel, but stated that the jurors were expected at 2:00 p.m., and if there was no settlement by 1:00 p.m., the matter would proceed to trial. Defendant agreed to the additional time, but asked if he could discuss the matter with the court. The trial court responded that it was not offering an indicated sentence and was not involved in the discussions.

After returning from the lunch recess, defendant asked if another offer would be made during trial. The trial court stated that there would be no more offers. Defendant asked if he could have additional time to consult with his family. The trial court denied his request and allowed him five minutes to consult with defense counsel.

When the proceedings resumed, the prosecutor stated that defendant had chosen to plead guilty to the determinate term of 44 years and eight months. The negotiated agreement involved amending counts 5 and 6 to violations of section 288.5 and dismissing counts 7 and 8. The maximum potential sentence with these amendments was 99 years. After the trial court explained the sentence and defendant consulted with his counsel, he stated that he understood the agreement as recited.

The prosecutor moved to amend the information, which was granted. The trial court then reviewed the waiver of rights form that defendant had completed. Defendant acknowledged that he had initialed and signed the form and that he had an opportunity to discuss with his counsel each of the items that he had initialed. The trial court advised defendant of his rights to a jury trial, to cross-examine witnesses, to subpoena witnesses, to present defense evidence, and to testify on his own behalf or to remain silent. Defendant asked to speak to his counsel. The request was granted. After speaking to his

9

counsel, defendant stated that he understood his rights and that he understood that he was giving up these rights by pleading no contest. When he was asked whether he understood that a plea of no contest "means the very same thing as a guilty plea," defendant stated, "That's what I'm having an issue with." The trial court explained that "a plea of no contest has the same legal effect as a plea of guilty" and that if he decided to plead no contest, the court would make a finding of guilt. Defendant responded, "[M]y understanding was that I would not plead guilty, but I would accept the punishment." The trial court explained again, "You will be pleading no contest, if that's what you decide to do. But legally I make a finding of guilt based upon your plea." After consulting with his counsel, defendant stated, "I understand."

The trial court next asked defendant if anyone had made any promises to him other than those stated in court. Defendant answered, "No, ma'am. I wish I had a little more time to decide this." The trial court noted that there had been a lot of time between his arrest and the current proceeding and that a jury was waiting. Defendant agreed, but wanted to talk to his family. The trial court did not allow defendant to have additional time to make a decision. Defendant agreed that he had had sufficient time to consult with his attorney. Defendant also stated that no one had threatened or coerced him into pleading, he was not under the influence of any alcohol, drugs, or medication that affected his ability to understand the proceedings, and he had no additional questions.

Defendant pleaded no contest to counts 1 through 6 and 9 through 13. The trial court accepted the pleas and made a finding of guilt. Sentencing was set for January 9, 2015.

### G. Second *Marsden* Hearing

A *Marsden* hearing was held on December 22, 2014. Defendant stated that he wanted to withdraw his no contest plea, because he had entered his plea under false

10

pretenses and duress. He was told by counsel that he was going to lose and get a life sentence. He was scared, did not have enough time to decide, and did not realize that there were people who were willing to help him. Defendant believed that he was "over-punished" by both offers, because he did not hurt any of the children and did not sexually molest them. In discussing the offers with defense counsel, defendant asked her what she would do. She told him that the decision was his and asked whether he wanted appellate rights or a determinate term. Defendant did not understand what that meant, so he accepted the offer and thought that he could appeal.

Defendant asked his counsel to file a motion to withdraw his plea in October. She told him to talk to his family, which he did. He sent letters to defense counsel, but she did not respond. Defense counsel stated that defendant had not been clear about whether he wanted to pursue a *Marsden* motion or a motion to withdraw his plea. It was only in December that he stated that he wanted a *Marsden* hearing. Defendant asserted that he had communicated to counsel in September that he wanted her to file a motion to withdraw his plea. The trial court asked defense counsel if she was willing to file a motion to withdraw the plea. She responded that it was unclear what defendant's basis for the motion was.

Defendant stated again that his attorney had engaged in scare tactics by telling him that he was going to lose. He had read statements from children that showed support for the defense. Defendant felt that he had been manipulated by the system. The trial court asked defendant whether he had been pressured into entering a plea. Defendant stated, "She said you're going to lose, and you're going to get at least 30 years to life. That is why I took the plea deal. And I feel that was negligent of her to say to me. Therefore, I have the right to withdraw my plea deal and fight this case with a new attorney."

Defense counsel stated that she had a lengthy conversation with defendant about whether to accept the offer or proceed to trial. Defendant was concerned about his ability to appeal his convictions and he did not want the girls to testify. Defense counsel told

11

him that a trial would generate more issues for an appeal. She also stated that he knew that at least four of the girls, if not all, would testify poorly for him. Defendant agreed that she had said that he would have more appellate rights if he went to trial. He also told his attorney that if he was going to get a life sentence, he did not want to put the girls through a trial. He claimed that most of the girls and their parents did not want to see him get this kind of punishment.

According to defense counsel, defendant asked her what the issues on appeal would be. She explained that it was very hard for her to anticipate what they would be and whether they would result in a reversal of his convictions. Defense counsel repeatedly told him that if he wanted to have an appeal, he needed to go to trial. Defense counsel also told him that the offer was for a very long time and was effectively an indeterminate term, but his prison experience might be better in terms of housing and privileges with a determinate term. She told him that she did not endorse the offer. Defendant asked her what was the smartest decision he could make. He also brought up factual inconsistencies with the girls and she explained that the purpose of a trial would be to resolve those discrepancies. Defendant was hesitant about going through the process. They discussed the issues for about an hour and a half in the holding cell and she did not know what defendant's decision would be until they returned to the courtroom.

Defendant again claimed that his counsel had not done her job. Defense counsel stated that the only basis for a motion to withdraw the plea was ineffective assistance of counsel, and unless the trial court decided that she had provided ineffective assistance, she would not file a motion to withdraw his plea. Defendant claimed that the lengthy delay before trial tainted the children's memories and he took the deal because counsel would not advise him. Defendant acknowledged that he did not make wise decisions while caring for the children, because he had a "severe alcoholic problem." He believed that the courts were making him look like a bad person. He did not have pornography

12

and he did not have a sexual intent to hurt the girls. He did not understand about the meaning of a no contest plea. Defendant repeated that defense counsel was incompetent.

The trial court took the matter under submission. On January 5, 2105, the trial court filed a written order and denied the *Marsden* motion.

## H. Third *Marsden* Hearing

On January 29, 2015, the trial court held a third *Marsden* hearing. Though defendant had requested the hearing, he was unprepared to proceed. The trial court did not continue the hearing and asked defendant to explain his reasons for the *Marsden* hearing. Defendant repeated the concerns that he had set forth at his second *Marsden* hearing. He wanted to go to trial, but he could not with an attorney who was "set on [his] defeat." He was misled about his no contest plea. Defense counsel refused to bring a motion to withdraw his plea. He believed that some of the parents did not believe that he had done anything wrong. Defendant did not know how 64,000 child pornography images could be on his computer. Defense counsel stated that a defense forensic expert had located not only the images discovered by the police but also videos that had not been discovered by the police. Defendant claimed that he was unaware of 90 percent of the child pornography images and mentioned that he was "a drunk addicted to the pornography . . . ." When defendant indicated that he wanted to represent himself at his sentencing hearing the following day, the trial court stated that the hearing would not be continued if he chose to proceed pro per. The trial court denied the *Marsden* motion. Defendant decided to defer his decision to represent himself until the next day.

## I. Sentencing Hearing

On January 15, 2015, the sentencing hearing was held. Defendant stated that he would not be representing himself. Pursuant to the negotiated agreement, the trial court

13

imposed: the aggravated term of eight years for count 1; two years (one-third the midterm of six years) consecutively for count 2; two years (one-third the midterm of six years) consecutively for count 3; the aggravated term of eight years concurrently for count four; the aggravated term of eight years concurrently for count nine; the aggravated term of eight years concurrently for count 10; the aggravated term of eight years concurrently for count 11; the aggravated term of eight years concurrently for count 12; eight months (one-third the midterm of two years) consecutively for count 13; the aggravated term of 16 years consecutively for count 5; and the aggravated term of 16 years consecutively for count 6. The total term was 44 years and eight months. Defendant received 1217 days of presentence custody credit. The trial court also imposed various fines, fees, and assessments. Defendant was advised that he was entitled to a restitution hearing. The remaining counts were dismissed.

## II. Discussion

Appointed appellate counsel has filed an opening brief which states the case and the facts but raises no issues. Defendant has submitted three letter briefs.

In his brief, dated July 6, 2016, defendant contends that his no contest plea was "obtained by the state without [his] knowledge and appreciation of its consequences . . . ." The change of plea hearing establishes that defendant was fully advised of his rights and he waived them.

Defendant claims that he was "manically depressed and [his] medication lapsed during plea hearings and *Marsden* hearings . . . ." There is nothing in the record on appeal to support this claim.

Defendant refers to the denial of his three *Marsden* motions and his attempts to withdraw his plea.

Under the *Marsden* standard, a defendant is entitled to substitute counsel when the trial court finds that "the defendant has shown that a failure to replace the appointed

14

attorney would substantially impair the right to assistance of counsel [citation]." (*People v. Smith* (1993) 6 Cal.4th 684, 696 (*Smith*).) We review the trial court's denial of a *Marsden* motion under the abuse of discretion standard. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085.)

Here, the trial court allowed defendant to state his complaints. Defense counsel responded to each of defendant's points. "To the extent there was a credibility question between defendant and counsel at the hearing, the court was 'entitled to accept counsel's explanation.'" (*Smith*, *supra*, 6 Cal.4th at p. 696, quoting *People v. Webster* (1991) 54 Cal.3d 411, 436.) Accordingly, the trial court did not abuse its discretion when it denied defendant's *Marsden* motions.

Defendant also argues that his plea was the "product of ineffective assistance of counsel." He claims that he was denied experts to evaluate the victim and to pursue his belief that the investigators improperly interviewed victims. He also claims that his counsel rendered ineffective assistance because she had no defense, never interviewed him, and wanted him "to take the stand w/ the mentality [they] would 'go down swinging'. . . ." He further asserts that his attorneys denied him his right to a speedy trial.

To succeed on an appellate claim of ineffective assistance, a defendant must establish that his trial counsel's performance was deficient and that his defense was prejudiced by the deficiency. (*People v. Ledesma* (1987) 43 Cal.3d 171, 218; *Strickland v. Washington* (1984) 466 U.S. 668, 687.) Defendant has failed to make the requisite showing.

In his brief, dated July 15, 2016, defendant argues that he pleaded guilty due to the "vindictiveness of the D.A., the courts, and the illegal investigative tactics of police officers w/o understanding that a trial was a better option." The record on appeal does not support this argument.

Defendant asserts that he is "only guilty of a lewd act of inappropriateness (should be child annoyance) with one of the complaining witnesses because I was blacked out

15

drunk and thought my actions were funny" and the remaining convictions are "ridiculous." The record does not support defendant's claim. He acknowledges that his computer was "riddled with illegal content" but he "had no idea these things were stored on a hard drive automatically." He also asserts that "[m]y fetish was barely legal girls & bi-sexual women." In his brief, dated July 18, 2016, defendant next asks this court to consider his version of events that began in 2001. He maintains that he has been a victim of gender bias and a double standard his entire life. None of this information is relevant to any issue on appeal.

Defendant argues that Lauren should have been evaluated by experts, because she did not demonstrate any of the behaviors of a sexual abuse victim and her brain should have been tested. As previously stated, defendant has failed to show that his trial counsel rendered ineffective assistance.

Defendant also refers to D. and blames her for introducing his "innocent group of girls to topless truth or dare" and the Omegle Web site. He presents his version of events that led to his arrest. He claims that the photo of Karin was a "joke" and he thought that it had been deleted. He blames his conduct on his alcoholism, minimizes his conduct, and claims that he deserves justice. None of this is relevant to any issue on appeal.

Defendant has requested new appellate counsel, because his counsel has responded "'half-heartedly' without any real effort to assist [him] beyond the realm of 'I'm unimpressed with your views on the case.'" Defendant has tried to fire him twice. He argues that his appointed appellate counsel has failed to communicate with him and has not adequately presented his case in his *Wende* brief.[3] Defendant's argument fails. Pursuant to *Wende*, *supra*, 25 Cal.3d 436, we have reviewed the entire record and have

---

[3] Defendant also asserts that his counsel's *Wende* brief contains a factual error, that is, that defendant was naked while checking one of the children for a rash. This error has been corrected in our summary of the preliminary hearing transcript and thus there has been no prejudice to defendant.

16

concluded that there are no arguable issues on appeal.  Thus, appellate counsel has not rendered ineffective assistance by filing a *Wende* brief.

### III.    Disposition

The judgment is affirmed.

_____
Mihara, J.

WE CONCUR:


_____
Elia, Acting P. J.


_____
Bamattre-Manoukian, J.